UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Angel Suttles,      :   Case No. 1:10-cv-494
                    :
    Plaintiff,      :
                    :
vs.                 :
                    :
U.S. Bank, N.A.,    :
                    :
    Defendant.      :

**ORDER**

Before the Court is Defendant's motion for summary judgment. (Doc. 30) Defendant seeks judgment on Plaintiff's claims arising under federal and state law for disability discrimination, and failure to accommodate her disability. Plaintiff opposes the motion (Doc. 31), and Defendant has filed its reply. (Doc. 38) Defendant has also moved to exclude Plaintiff's expert report and testimony (Doc. 37), which Plaintiff opposes. (Doc. 40) For the following reasons, the Court will grant both of Defendant's motions.

**FACTUAL BACKGROUND**

Plaintiff Angel Suttles is deaf. Her first language is American Sign Language, although she is able to read and write English. She testified that she can read lips to some extent, but when she cannot understand she needs someone to either sign to her or to write the message being communicated for her to read. She interviewed for a position as a lockbox clerk with

-1-

U.S. Bank in 2006, and Suttles used a sign interpreter for her interview.  Bank employee Angie Clemmons who participated in her interview is able to communicate in ASL, although she is not certified as an ASL translator and has no credentials.  Suttles was hired for the position and attended an orientation session in June 2006.  She was provided with an interpreter for that orientation, during which she reviewed the bank's Code of Ethics and Employee Handbook.  She also reviewed the bank's Cincinnati Retail Lockbox Attendance and Vacation Policy, and acknowledged that she had done so by signing the document on June 17, 2006. (Suttles Ex. 8)

The Cincinnati attendance policy states that prompt and regular attendance is required, and sets forth a number of guidelines and requirements.  As relevant here, it provides that absences from work are accumulated over a "rolling" year, that is any absences over the 12 months preceding any absence.  An employee must notify his or her manager directly if they cannot come to work.  Sick time must be used for unplanned absences (when an employee calls in the same day as an assigned shift). An employee is entitled to six sick days per year, and a verbal warning is given on the sixth such absence.  Employees may schedule pre-approved sick hours for medical appointments and school conferences, which are not counted on the attendance record unless the time reported is excessive.  If an employee

must leave early and has worked the majority of the shift, it would not be counted against them. Managers may use discretion when determining the validity of such early departures. If deemed unnecessary, the early departure will be considered one half of an unexcused absence. Tardiness is tracked separately from absences, and more than six tardies in a rolling 12-month period results in a verbal warning. Warnings for both absences and being late are escalated if attendance issues persist: a verbal warning can lead to a written warning, which in turn can lead to further action, up to and including termination, if there are additional absences thereafter.

Suttles testified about her job duties: "I had to type amounts and words. I had to match amounts to words and then put them in data -- enter the data, the amount. Well, I had to download all the information from a system. There was a system I had to read and then to go to pull the information, those amounts, and type in the information." (Suttles Dep. at 21-22) She was able to perform her job duties without being able to hear.

An interpreter was available for Suttles during her orientation session and her initial training period. She testified that at the end of that period, the interpreter reported to Clemmons (who was Suttles' shift supervisor) that Suttles did not need an interpreter to perform her daily tasks,

but would need one to attend large or group meetings. If she had a simple question about work, she was able to ask Clemmons for help without an interpreter. Clemmons denied that the interpreter reported this need to her. The Court accepts Suttles' testimony on this issue for purposes of summary judgment.

At the first group meeting that Suttles attended, no interpreter was present. Suttles testified that she reminded Clemmons that she needed an interpreter, and Clemmons said "oops," indicating to Suttles that she had forgotten to arrange for one. It was too late to find an interpreter for that meeting, so Clemmons signed part of what was said at the meeting and then met individually with Suttles afterwards to review what had been said. Suttles testified that Clemmons continued to do this for other group meetings she attended.

Clemmons held monthly "one on one" meetings with Suttles. James McDaniel, who was Suttles' team "lead," also held some of the one on one meetings with her. The one on one meeting reviewed job performance statistics (including competency in service areas and production in data entry functions), as well as reporting on compliance with the attendance policy. Each monthly review form was signed by the reviewer and by Suttles. Each month, Suttles was given a specific update on the number of occurrences she had accumulated for the rolling 12-month period.

Her first one on one review in September 2006 stated that she had 1.5 occurrences for the period. (Suttles Ex. 9) In her January 2007 review, Clemmons praised her productivity and competency, but also told Suttles that she had already accumulated 4.5 attendance occurrences over the rolling 12-month period, telling her to "watch your attendance." (Suttles Ex. 10) By the next month, she had accumulated 7.5 occurrences; Clemmons told Suttles, "Remember you cannot miss another day until at least after 11/20/07 to allow some of the occurrences to drop off." (Suttles Ex. 10, at CM/ECF PAGEID 512) Suttles also received a written notification of her absences on February 23. (Exhibit 12) Clemmons warned her that further absences may be without pay and may result in further disciplinary action. Clemmons also reminded Suttles about the bank's Employee Assistance Program, where counselors were available round the clock to speak with her about any specific problems she had.

Suttles did not have another absence occurrence until July 2007, when Clemmons again warned her that "you need to be very aware of your occurrences." (Suttles Ex. 10, at PAGEID 517) She was late one time in September, and in her monthly one on one review Clemmons told her to "continue to monitor your attendance. You will not have any occurrences fall off until November. You did have a tardy this month on 9/7/07 which puts you at 4 tardies within a rolling twelve months, two more and you will be placed

on a verbal.  You really need to monitor your attendance, it does not look good."  (Id. at PAGEID 518) Despite this warning, Suttles was late twice in October and had two occurrences in November.  Because two of her earliest occurrences had fallen off of the 12-month rolling calendar, Clemmons took no further action at that time.  Suttles had another occurrence fall off in December 2007 which Clemmons verified for her, and three more fall in February 2008.  Clemmons cautioned her at that time to monitor her attendance carefully.  But by April 2008, Suttles had accumulated six incidents of being late within the 12-month period.  On May 5, 2008, Clemmons issued Suttles written reminders about both her absences and her tardiness.  (Suttles Exs. 14 and 15) Clemmons listed the date of each incident, and reminded Suttles that the employee assistance program was available, providing a toll-free number.[1]  In her June 2008 one on one meeting with James McDaniel, he warned her in writing that "It is imperative that you monitor your attendance in both occurrences as well as tardies."  (Suttles Ex. 11 at PAGEID 537) She also received another written notice on July 11 about her incidents of being late.  (Suttles Ex. 16)

In July 2008, one of her occurrences dropped off the 12-

---

[1] Suttles testified that she asked Clemmons at some point during her employment if the bank could provide a TTD/TTY telephone for her to use, and one was installed in the lockbox facility's lobby.

month accounting period, but in August she incurred another incident. In September 2008 she had an incident of being late, and was warned that one more incident would result in a verbal warning. Suttles was also counseled to monitor her sick days. Suttles received one occurrence in October and two in November 2008, along with two more written notifications about being late and her absenteeism. (Suttles Exs. 17 and 18)

Suttles received annual performance reviews during her employment with the bank. Clemmons completed her first annual review for 2006 and rated her skills quite favorably. But Clemmons also stated that "Her attendance could improve" as she had already incurred four occurrences since starting the job the previous July. (Suttles Ex. 21) In her 2007 annual review which Suttles signed on February 16, 2008, Clemmons stated that Suttles performed well on her data entry skills but that she and McDaniel had spoken with Suttles about her problems with "staying focused, talking, walking around, attendance, quality, and team work." (Suttles Ex. 22, CM/ECF PAGEID 572) Specifically addressing her attendance, Clemmons stated that she had regular conversations with Suttles about her attendance problems. By November 25, 2007, Suttles was told that "she was on the borderline" of receiving a written warning for violating the attendance policy. She had accumulated seven occurrences, four incidents of being late for work, and roughly 23 early departures (although some of

the early departures were apparently approved because Suttles had completed her shift work on those occasions, or they were made up later).

On January 3, 2009, Clemmons issued Suttles a formal written warning about her attendance problems, stating that her absenteeism and tardiness "is excessive and is affecting the workflow and performance of the group." (Suttles Ex. 19) Suttles was warned that "[i]mmediate and continuous improvement in your attendance is required. It is expected that you will be at work every day, unless you have an earned, scheduled and pre-approved vacation day. Further absences/tardies will be without pay and may result in further disciplinary action, up to and including termination." Clemmons invited Suttles to talk with her if she needed assistance, and reminded her again about the services of the EAP program. At the bottom of the warning, Clemmons stated: "Your signature acknowledges receipt of this memo, as well as confirms the discussion we have had about the seriousness of your continued absences and/or tardiness."

During the evening of February 5, 2009, Suttles testified that she sent a text message to Clemmons asking her if she knew a bus route number she could take to work because her car had broken down. Clemmons texted a message back and told Suttles that she needed to be on time, saying "You know where you stand." (Suttles Dep. at 48-49) Nevertheless, Suttles was late for work

on February 6, and she appeared in Karen Kruse's office. Kruse was then the lockbox department manager. Suttles testified that she went to Kruse to ask for a schedule change. Kruse testified that Suttles sat down and wrote on a piece of paper that she was sorry she was late. Kruse thought that Suttles seemed worried about being late. She told Kruse that she had car troubles and had to take the bus, and that she wanted to look at a schedule change. Kruse responded by writing that she was sorry to hear of her difficulties, but that they would have to talk to Clemmons about the details. Kruse said Suttles read her response, then crumpled up the paper and left her office.

Clemmons prepared a "Significant event form" that day documenting her subsequent conversation with Suttles. According to Clemmons, Suttles came to her to explain why she was late, telling Clemmons that she had already talked to Kruse due to her attendance record situation. Suttles told Clemmons that she had asked Kruse for a temporary schedule change because she would have to ride the bus. Clemmons asked her why she needed a schedule change, and Suttles said she did not feel comfortable riding the bus on weekends. She said she felt more comfortable when she saw that another employee was on the same bus, and Clemmons told her that employee worked the same schedule as Suttles, Friday to Monday. Suttles said she did not want to ride the bus on the weekends. Clemmons noted that the subject of

"attendance is always a topic of discussion between [Suttles] and me. She always has some concern with her attendance; she is currently on Written Warning for tardies and has accumulated another tardy today. As well as she is on a verbal notification of her sick days in which she called in sick again on 1/30/09." (Clemmons Ex. 11)

Clemmons was apparently preparing Suttles' 2008 annual review about the same time, as Clemmons commented in the review that "Angel's attendance is extremely poor and is one of the areas that needs the most improvement immediately. Angel has had 7 occurrences within a rolling twelve months ... . She has also accumulated seven unscheduled tardies." (Suttles Ex. 8 at PAGEID 223) Clemmons summarized the several verbal warnings that had been given to Suttles about the attendance policy and noting that Suttles had offered several excuses, including most recently that her car had broken down.

Clemmons testified that after these events on February 6, she decided to review Suttles' attendance problems with Kruse. She and Kruse consulted with Roberta Sims in the Human Resources Department, and they all agreed that Suttles should be terminated. Clemmons asked Sims if she should arrange for an interpreter for the meeting with Suttles to give her notice. Sims responded that since Suttles did not report problems communicating about her job, she did not see the necessity of

doing so. Clemmons and Kruse then met with Suttles and informed her that she was being terminated. Clemmons testified that Suttles responded, "I can't believe this is happening." (Clemmons Dep. at 89) After the meeting, Clemmons collected Suttles' bank identification and Suttles left the building. She returned a short time later, saying that she needed some documentation of her termination. Dan Nocella, another HR generalist, met with her and told her the bank would provide her with the necessary confirmations.

Suttles filed a discrimination claim with the EEOC and stated in her questionnaire: "When I asked for a transfer to another shift (weekend to first shift) then was asked to attend a meeting and without a trained or certified sign language interpreter. They attempted to communicate to me why they were terminating my employment. They tried to use a invoice signer and write on paper. [sic] English is my 2nd language so I didn't understand fully 100% why they terminated me." (Suttles Ex. 24 at 2) Suttles admitted in that questionnaire that she had not asked the bank for any assistance or change in working conditions because of her disability, and that she did not need assistance or a change in working conditions in order to do her job. (<u>Id</u>. at 3)

She filed her lawsuit alleging disability discrimination and a failure to accommodate on August 4, 2010. (Doc. 3)

**ANALYSIS**

Summary Judgment Standards

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An assertion of a undisputed fact must be supported by citations to particular parts of the record, including depositions, affidavits, admissions, and interrogatory answers. The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation omitted).

The Court is not duty bound to search the entire record in an effort to establish a lack of material facts. Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir. 1992). Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment...," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. Anderson, 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court

-12-

construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250. "If the evidence is merely colorable, ... or is not significantly probative, ... the court may grant judgment." Anderson, 477 U.S. at 249-50 (citations omitted).

Disability Discrimination

In order to establish her disability discrimination claim, Suttles must demonstrate that she was disabled; she was otherwise qualified to do her job with or without reasonable accommodation; and she was terminated solely due to her disability. Macy v. Hopkins County Sch. Board, 484 F.3d 357, 364 (6th Cir. 2007); Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1178 (6th Cir. 1996).

In the absence of direct evidence, the familiar McDonnell-Douglas burden-shifting framework applies when analyzing a claim

of disability discrimination based on circumstantial evidence. U.S. Bank's motion does not challenge Suttles' ability to establish a prima facie case, a burden which is not onerous in any event.  The bank contends that it has come forward with a reasonable and legitimate reason for her termination: her excessive tardiness and violations of the attendance policy. Suttles must then demonstrate that the bank's proffered reason is mere pretext and that the true reason was because she is disabled.  She may do so by showing that the bank's stated reason has no factual basis; or that it did not actually motivate her termination; or that the proffered reason was insufficient to motivate the decision.  Macy v. Hopkins County, 484 F.3d at 366 (citing Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994).

U.S. Bank argues, and the Court agrees, that Suttles cannot establish a genuine factual dispute on the question of pretext. She has no direct evidence of disability discrimination, nor any evidence even suggesting that anyone even commented on the fact that she is disabled and cannot hear.  She does not deny that she was late or absent from work on the occasions cited in the bank's records.  She admits that she signed each and every monthly one-on-one review form that cited her absences from work and warned her about her failure to adhere to the policy.  She does not challenge the bank's evidence that several other non-disabled

employees were terminated for violating the bank's attendance policies. She admitted receiving and acknowledging that she understood the written attendance policy when she began her job. There is simply nothing in this record to suggest, much less raise a genuine dispute, that she was terminated because she was deaf, and not because of her repeated violations of the attendance policy.

Failure to Accommodate

The ADA provides that an employer must reasonably accommodate an employee's disability, unless the employer can show that the accommodation would impose an undue hardship on the operation of its business. Smith v. Ameritech, 129 F.3d 857, 866 (6th Cir. 1997), quoting 42 U.S.C. § 12112(b)(5). To support her failure to accommodate claim, Suttles must show she has a disability, that she was otherwise qualified for her job, and that the bank refused her request for a reasonable accommodation. Only the third element is in dispute.

Suttles contends that a jury should determine if the bank refused her a reasonable accommodation of providing an ASL interpreter for all group meetings held at work, and/or for one-on-one and disciplinary meetings. She argues that Clemmons knew that her training interpreter recommended that an interpreter be provided, and that Suttles had asked Clemmons why an interpreter was not provided for the first group meeting Suttles attended.

These interactions served as a functional request for that accommodation.  Suttles argues that the bank's failure to provide that accommodation caused her to not understand the bank's attendance policies, which in turn led to her discipline and ultimately her discharge for violating that policy.

Suttles admitted in her deposition that during her orientation, an interpreter helped her review the attendance policy and the Cincinnati Lockbox attendance policy.  She signed the attendance policy indicating her acknowledgment at that time that she had reviewed and understood the policy.  Suttles testified that she is able to read text written in English, and her job duties included reading various documents.  She admitted that she could and did use her cell phone to send text messages in English to Clemmons on several occasions.  When she met with Kruse on February 6, 2009, she wrote out her concern about being late again for work.  Kruse had no difficulty comprehending what she wrote, and Suttles understood what Kruse told her - she would have to deal with Clemmons about being late and about her request for a shift change.  While Suttles now complains that she did not understand things when Clemmons would sign and finger-spell for her, she did not tell Clemmons that she did not understand Clemmons' written communications to her about her attendance problems.  Each time Suttles had a problem, either an occurrence or an incident of being late, she was warned in writing about how

many occurrences she had accumulated, and reminded of the consequences of violating the policy. While she contends that she repeatedly asked Clemmons to explain the policy to her, she does not dispute that both Clemmons and McDaniel repeatedly informed her of her specific absences, and informed her about the consequences of incurring additional absences. The fact that she asked for explanations at various times does not create a genuine dispute that she did not understand the policy because an ASL interpreter did not explain it to her on these occasions.

To claim that she needed an ASL interpreter in order to adequately understand written English generally or the attendance policy particularly, Suttles relies on a report written by Robert Coltrane, which is attached as Exhibit A to her memorandum in opposition to the bank's motion. Mr. Coltrane is the co-owner of Deaf Choice, which provides ASL interpreters for and advocacy services on behalf of the deaf. Mr. Coltrane's report contains a recitation on the legal requirements of the Americans with Disabilities Act, and recites statistics compiled by Gallaudet University about the general reading and comprehension abilities of deaf children. He explains the benefits of ASL for the deaf, as well as some of its drawbacks, especially in a legal setting. Mr. Coltrane then presents his "analysis," which states that the "average deaf person" reads at or below a 4th grade level, and therefore reliance on written English communications will not be

"effective." Mr. Coltrane then opines that the ADA requires an employer to provide an accommodation in order to ensure "effective" communication with a deaf person.

Defendant has moved to exclude Coltrane's report based on Fed. R. Evid. 702. (Doc. 37) That rule permits a witness with relevant specialized knowledge to offer an opinion when: "(b) the testimony is based upon sufficient facts or data, (c) the testimony is the product of reliable principles and methods, and (d) the expert has reliably applied the principles and methods to the facts of the case." As the Sixth Circuit has clearly held, the Rule does not permit even a well-qualified expert to offer hypotheses or speculative theories about a fact in dispute. Tamraz v. Lincoln Elec. Co., 620 F.3d 665, 670-671 (6th Cir. 2010).

Mr. Coltrane's education and his experience are very interesting. But his report offers no opinions about Ms. Suttles individually. He does not state that he has met with her, or that he knows anything about her reading ability or her educational background. He has not offered any opinion on Suttles' specific reading or comprehension abilities, and it is questionable whether he would be qualified to do so in any event. The report does not reliably apply any principles or methods to the facts of this case. Therefore, Coltrane's report does not constitute admissible, probative evidence that raises a genuine

-18-

issue of material fact on the question of whether Suttles understood her employer's attendance policy and was able to comprehend its requirements without an ASL interpreter, or whether the bank failed to provide a reasonable accommodation to her.  The Court will grant the motion to exclude the report because it clearly fails to meet the requirements of Rule 702.

**CONCLUSION**

For all of the foregoing reasons, the Court grants the Defendant's motion for summary judgment.  (Doc. 30)  The motion to exclude Plaintiff's expert report (Doc. 37) is granted.  Plaintiff's claims are dismissed with prejudice.

SO ORDERED.

THIS CASE IS CLOSED.

DATED: March 19, 2012            <u>s/Sandra S. Beckwith</u>
                                 Sandra S. Beckwith
                                 Senior United States District Judge